**Mati GILL, Plaintiff,**

v.

**ARAB BANK, PLC, Defendant.**

**No. 11–CV–3706.**

United States District Court,
E.D. New York.

Nov. 6, 2012.

Gary M. Osen, Aaron Schlangerm, Ari Ungar, Joshua D. Glatter, Peter R. Kolker, Osen LLC, Hackensack, NJ, Aitan D. Goelman, Zuckerman Spaeder LLP, Washington, DC, for Plaintiff.

Kevin Walsh, Shand Stephens, Steven J. Young, Douglas Walter Mateyaschuk, DLA Piper U.S. LLP, New York, NY, for Defendant.

## MEMORANDUM, ORDER AND JUDGMENT GRANTING SUMMARY JUDGMENT

JACK B. WEINSTEIN, Senior District Judge:

*Table of Contents*

I. Introduction ........................................................546

II. Background ........................................................547
 A. Procedural History ..........................................547
 B. Burdens of Proof on Summary Judgment ......................548
 C. Consideration of Admissibility and Inferences on Summary Judgment.....548
 D. Adverse Inference from Withholding Documents .................549
 1. In General ............................................549
 2. Analogy to Lies .......................................551

III. Anti–Terrorism Act................................................553
 A. Unlawful Action ............................................553
 1. Conspiracy ...........................................554
 2. Material Support Statutes .............................554
 B. Mental State ...............................................555
 C. Causation ..................................................555

IV. Lack of Evidence Supporting Plaintiff's Claims......................556
 A. Conspiracy .................................................556
 B. Material Support............................................557
 1. Scienter ..............................................557
 a. *Respondeat Superior*..............................558
 b. Pertaining to Banking Services Provided to Saudi Committee.....558
 c. Pertaining to Banking Services Provided to Palestinian Charities .............................................560
 d. Pertaining to Banking Services Provided to Osama Hamdan........561
 e. Pertaining to Banking Services Provided to Other Individuals Allegedly Affiliated with Hamas, and Other Designated Terrorists .........................................562
 f. Pertaining to Compromise with Federal Regulators ...............565
 g. Summary..........................................566
 2. Proximate Cause ......................................567
 a. Hamas's Responsibility for Plaintiff's Injuries ....................567
 i. The Video .....................................567
 ii. Public Claims of Responsibility ...................570
 iii. Confession by Ayoub Ahmed Abu Karim and Reports Issued by the ISA ....................................570
 iv. Hamas's Reaction to the Death of Al–Za'anin ..............571
 b. Provision of Banking Services to Hamas ........................572

V. Conclusion ........................................................573

VI. Glossary ..........................................................573

## I. Introduction

In this action under the Anti–Terrorism Act, 18 U.S.C. § 2333(a) ("ATA"), by an American citizen in Israel injured by a shot fired in 2008 from Gaza, the defendant, Arab Bank plc ("Bank"), moves for summary judgment. The motion is granted. The case is dismissed.

The present memorandum (*Gill III*), explaining why the plaintiff, Mati Gill, cannot support his claims, is designed to be read with, and as part of, two previous memoranda issued in this case: *Gill v. Arab Bank, PLC*, 893 F.Supp.2d 474, 2012 WL 4960358 (Oct. 15, 2012) (*Gill I*), setting out the governing substantive and procedural law, and *Gill v. Arab Bank, PLC*, 893 F.Supp.2d 523, 2012 WL 5177592 (E.D.N.Y. Oct. 19, 2012) (*Gill II*), ruling on admissible evidence, particularly expert opinions.

Allegedly, the Bank caused plaintiff's injuries by maintaining accounts for, and providing services to, the Islamic Resistance Movement ("Hamas"), its leaders, and its affiliates. *See* Amended Complaint ("Am. Compl.") ¶ 47, Mar. 9, 2012, CM/ECF No. 17. The United States has designated Hamas a "terrorist" organization. *See* Designation of Foreign Terrorist Organizations, 62 Fed.Reg. 52,650 (Oct. 8, 1997); Exec. Ord. No. 12,947, 60 Fed.Reg. 5079, 5081 (Jan. 25, 1995).

It can be argued that much of plaintiff's evidence on Hamas's alleged connection to the attack is or is not hearsay; is or is not subject to a hearsay exception; is or is not reliable; is or is not relevant; and is or is not excludable because it is subject to prejudicial evaluation by the jury. But glued together by the considerable admissible expert testimony, *see Gill II*, the bits and pieces of plaintiff's evidence permit a jury to find by a preponderance that Hamas mounted a cruel and vicious attack on a group of civilians through one of its pawns, and then boasted proudly of a resulting injury suffered by an American national, Gill, in order to advertise its "accomplishment."

Plaintiff must establish by a preponderance of evidence that the Bank *recklessly, knowingly,* or *intentionally,* and *proximately, caused* plaintiff's injuries, either by the Bank's own actions or in a conspiracy with Hamas or other terrorist organizations. *See Gill I.*

It cannot do so. Hamas is not the defendant; the Bank is. And the evidence does not prove that the Bank acted with an improper state of mind or proximately caused plaintiff's injury.

## II. Background
### A. Procedural History

Gill filed his complaint on August 1, 2011. *See* Complaint, Aug. 1, 2012, CM/ECF No. 1. His amended complaint was filed in March of 2012. *See* Amended Complaint ("Am. Compl."), Mar. 9, 2012, CM/ECF No. 17. Five claims are asserted:

1. The Bank aided and abetted Hamas's act of international terrorism in violation of 18 U.S.C. § 2333(a). *See* Am. Compl. ¶¶ 214–24.

2. The Bank conspired with Hamas and others to commit an act of international terrorism, and committed overt acts in furtherance of that conspiracy in violation of 18 U.S.C. §§ 2332(b) and 2333(a). *See id.* ¶¶ 225–32.

3. The Bank intentionally or recklessly provided material support to terrorists in violation of 18 U.S.C. § 2339A. *See id.* ¶¶ 233–39.

4. The Bank intentionally or recklessly provided material support to a government-designated Foreign Terrorist Organization ("FTO") by providing financial services to Hamas and its agents in violation of 18 U.S.C. § 2339B. *See id.* ¶¶ 240–49.

5. The Bank violated 18 U.S.C. § 2339C by unlawfully and willfully or recklessly providing or collecting funds for Hamas with the intention that the funds would be used—or the knowledge that they would be

used—to facilitate international terrorism. *See id.* ¶¶ 250–55.

From the outset, the court indicated to plaintiff its burden of connecting the shooting to the Bank's actions. *See* Order, Apr. 18, 2012, CM/ECF No. 23.

Defendant moved on April 9, 2012 to dismiss the amended complaint for lack of subject matter jurisdiction and for failure to state a claim. *See* Mot. to Dismiss the Am. Compl., Apr. 9, 2012, CM/ECF No. 133. That motion was denied in part on September 12, 2012, 891 F.Supp.2d 335, 2012 WL 4026941 (E.D.N.Y.2012). *See Gill I.* Only plaintiff's first claim, the aiding and abetting claim, was dismissed on the pleadings. *Id.*

The parties were instructed that discovery would end on September 18, 2012. *See* Minute Entry, June 28, 2012, CM/ECF No. 39. Preparation for trial was to be coordinated with the years of discovery conducted in other terrorism-related cases in this court, consolidated under the caption *Linde v. Arab Bank, PLC,* No. 04–CV–2799 (E.D.N.Y.) (*"Linde* Litigation"), in which the Bank is a defendant. *See* Hr'g Tr., June 28, 2012, at 36. Since the issues of fact and law differ in the instant case from those in the *Linde* Litigation, issues of admissibility, discovery and probative force are considered *ab initio.*

Dates were set for: submission of a motion for summary judgment, *in limine* proceedings and a trial. *See* Scheduling Order, July 3, 2012, CM/ECF No. 38. Motions *in limine* on expert and lay testimony were heard on October 3, 2012. *See* Minute Entry, Oct. 3, 2012, CM/ECF No. 180. Rulings on admissibility of initial expert proof were made orally on the record and in *Gill II.*

### B. Burdens of Proof on Summary Judgment

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(a); *see Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The movant bears the burden of establishing "that there is an absence of evidence to support [an essential element] of the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In determining whether the movant has met its burden, "the court is required to resolve all ambiguities and credit all factual inferences that could be drawn in favor of the party against whom summary judgment is sought." *Vivenzio v. City of Syracuse,* 611 F.3d 98, 106 (2d Cir.2010).

Where, as here, the non-moving party bears the burden of proof, it is incumbent upon that party to identify specific admissible evidence demonstrating a genuine issue for trial. *See* Fed.R.Civ.P. 56(e); *Anderson,* 477 U.S. at 249, 106 S.Ct. 2505. A non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), and "may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Hicks v. Baines,* 593 F.3d 159, 166 (2d Cir.2010) (citation omitted). If the non-movant fails "to come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on" an essential element of the claim, summary judgment is granted. *See Burke v. Jacoby,* 981 F.2d 1372, 1379 (2d Cir.1992); *see also Anderson,* 477 U.S. at 248–49, 106 S.Ct. 2505.

### C. Consideration of Admissibility and Inferences on Summary Judgment

In ruling on a motion for summary judgment the court's function is not to deter-

mine the truth of an issue. Yet, deciding whether a genuine dispute exists necessarily entails a limited consideration of the "caliber" and "quality" of the evidence—viewed in a light most favorable to the non-moving party. *See Anderson,* 477 U.S. at 254, 106 S.Ct. 2505 (summary judgment is warranted "[i]f the evidence is merely colorable, *or is not significantly probative*" (citations omitted) (emphasis added)). *See* Fed.R.Civ.P. 56 advisory committee note to 1963 Amendment ("The very mission of the summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.").

Determining whether there is a need for trial requires an assessment of the admissibility and probative force of proof available to the plaintiff. *See* Fed.R.Civ.P. 56(c); *cf. Presbyterian Church of Sudan v. Talisman Energy, Inc.,* 582 F.3d 244, 264 (2d Cir.2009) ("[O]nly admissible evidence need be considered by the trial court in ruling on a motion for summary judgment." (internal quotation omitted)). "The court performs the same role at the summary judgment phase as at trial" in determining admissibility and appropriate inferences. *Raskin v. Wyatt Co.,* 125 F.3d 55, 66 (2d Cir.1997).

█ While the court in this case has already considered and ruled on the parties' motions *in limine* with respect to certain expert and lay testimony, *see Gill II,* questions of admissibility, probative force and inferences that may be drawn from the available evidence must be considered on the motion for summary judgment. If, on the available evidence and inferences that can be drawn from it, a jury could not rationally find an essential material proposition of fact to be more probably true than not, the case cannot go forward.

The plaintiff has had ample time and opportunity to complete discovery and to establish a record. The case is ripe for summary judgment.

## D. Adverse Inference from Withholding Documents

### 1. In General

On the present motion, particular consideration must be given to the appropriate inferences that can be drawn on summary judgment from a party's withholding of potentially relevant evidence. Here, the Bank has objected to requests for production of—and it has refused to produce—some documents on foreign bank secrecy grounds. Plaintiff contends that the withheld documents might directly answer questions about the Bank's conduct, the extent to which the Bank provided material support to terrorists, and its mental state. *See, e.g.,* Pl. Resp. to Arab Bank plc's Statement of Material Facts as to Which There Is No Genuine Dispute Pursuant to Local Civ. R. 56.1 ("Pl. Resp."), Oct. 23, 2012, CM/ECF 192, at 2–14.

In the *Linde* Litigation, sanctions were imposed against the Bank for its non-production of documents on the grounds of foreign bank secrecy. An order in *Linde* permits, but does not require, the jury to infer that this withholding supports plaintiff's contention that the Bank knowingly and purposefully provided material support to terrorists. *See Linde v. Arab Bank, PLC,* 269 F.R.D. 186, 205 (E.D.N.Y. 2012), *on appeal,* 706 F.3d 92, No. 10–4524, 2013 WL 203404 (2d Cir.2012). The *Linde* sanctions order also precluded the Bank "from making any argument or offering any evidence regarding its state of mind or any other issue that would find proof or refutation in withheld documents." *Id. Linde's* sanction order constituted an effort to resolve difficult and vexing problems posed by a party's withholding of documents present in foreign countries

and in the files of a custodian subject to foreign bank secrecy laws.

■ Principles of spoliation provide guidance. Spoliation is " 'the destruction or significant alteration of evidence or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation.' " *Byrnie v. Town of Cromwell, Bd. of Ed.*, 243 F.3d 93, 107 (2d Cir.2001) (quoting *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir.1999)). A variety of sanctions may be imposed upon a party that refuses to produce information when ordered to do so. *See, e.g.*, Fed.R.Civ.P. 37(b)(2); *Societe Int'l v. Rogers*, 357 U.S. 197, 208, 78 S.Ct. 1087, 2 L.Ed.2d 1255 (1958).

"Where ... the nature of the alleged breach of a discovery obligation is the nonproduction of evidence, a district court has broad discretion in fashioning an appropriate sanction, including the discretion to delay the start of trial (at the expense of the party that breached its obligation), to declare a mistrial if trial has already commenced, or to proceed with a trial and give an adverse inference instruction." *Res. Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 101 (2d Cir.2002).

■ Non-production and destruction are subject to the same sanctions. The decision to impose an adverse inference instruction for the destruction of evidence considers whether (1) "the party having control over the evidence had an obligation to preserve it at the time it was destroyed;" (2) "the records were destroyed with a culpable state of mind;" and (3) *"the destroyed evidence was 'relevant' to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense." Id.* (emphasis added).

■ "In the context of a request for an adverse inference instruction, the concept of 'relevance' encompasses not only the ordinary meaning of the term, but also that the destroyed evidence would have been favorable to the movant." *Zubulake v. UBS Warburg LLC*, 229 F.R.D. 422, 431 (S.D.N.Y.2004). Divining whether unavailable evidence would have been relevant is critical but "unavoidably imperfect, inasmuch as, in the absence of the destroyed [or withheld] evidence, we can only venture guesses with varying degrees of confidence as to what the missing evidence may have revealed." *Kronisch v. United States*, 150 F.3d 112, 127 (2d Cir.1998), *overruled on other grounds by Rotella v. Wood*, 528 U.S. 549, 120 S.Ct. 1075, 145 L.Ed.2d 1047 (2000). While the timeframe and identity of the custodian of withheld documents may shed some light on the relevance of non-produced information, "a court cannot infer that destroyed [evidence] would contradict the destroying party's theory of the case, and corroborate the other[ ] party's theory, simply based on upon temporal coincidence." *Consol. Aluminum Corp. v. Alcoa, Inc.*, 244 F.R.D. 335, 347 (M.D.La.2006). Evidence of the spoliating party's bad faith or gross negligence will also frequently "be sufficient to permit a jury to conclude that the missing evidence is favorable to the [other] party (satisfying the 'relevance' factor)." *Resid. Funding Corp.*, 306 F.3d at 109.

■ Convincing law establishes that "[t]he interest of the United States in depriving international terrorist organizations of funding that could be used to kill American citizens strongly outweighs the interest of a foreign nation in bank secrecy laws and the abstract or general assertion of sovereignty" by foreign governments where defendant-banks may be located. *See Wultz v. Bank of China, Ltd.*, —— F.Supp.2d ——, ——, No. 11–CV–1266, 2012 WL 5378961, at *7 (S.D.N.Y. Oct. 29, 2012). *See also Strauss v. Credit Lyonnais, S.A.*, 249

F.R.D. 429, 443 (E.D.N.Y.2008) (United States interest in "fully and fairly adjudicating matters before its courts .... combined with the United States's goals of combating terrorism ... diminishes any competing interests of the foreign state" (internal citations omitted)); *Weiss v. Nat'l Westminster Bank, PLC,* 242 F.R.D. 33, 48 (E.D.N.Y.2007) ("NatWest's noncompliance with plaintiffs' discovery requests would undermine important interests of the United States." (internal citation and quotation marks omitted)); *Linde v. Arab Bank, PLC,* 463 F.Supp.2d 310, 315 (E.D.N.Y.2006) ("Although maintaining bank secrecy is an important interest of the foreign jurisdictions where the discovery sought here resides—indeed the United States has enacted similar bank secrecy protection—that interest must yield to the interests of combating terrorism and compensating its victims."), *affirmed* 2007 WL 812918 (E.D.N.Y. Mar. 14, 2007).

The relevant legal precedents counsel in favor of ordering a financial institution to produce documents subject to foreign bank secrecy laws when the documents are relevant to discouraging international terrorism. In the instant case, the court assumes that plaintiff is entitled to some form of adverse inference based on the Bank's withholding of documents. But the issue which now must be addressed is this: what is the evidentiary weight to be added to plaintiff's case as a result of an adverse inference arising from a refusal to turn over documents on the ground of foreign bank secrecy laws? At the summary judgment stage, determining added probative force generated by any adverse inference is essential.

There is a serious question with respect to the criminal sanctions the Bank might have been subject to abroad had it produced the documents sought by plaintiff, raising questions of good faith which are not obviously contrary to the Bank's position. Evaluating a litigant's reasons for withholding documents that might be relevant requires an understanding of the foreign laws applicable to the withholding litigant, a balancing of national interests, as well as other pressures based on such matters as obligations to clients. An extensive trial by the court, and understanding by the jury, would be necessary to establish good faith. Presumably the trier would correlate probative force with its assessment of the reasonableness of the Bank's refusal to produce documents.

Placing the court's hand on the scale to favor or disfavor a party in a decision on the merits is discouraged. Under the Federal Rules, disputes must be decided on the merits if at all practicable. *See* Fed.R.Civ.P. 1. Responding to the withholding of documents by punishing the withholder through adverse inferences may not take into adequate account the need to assess probative force of missing documents; it should be discouraged. Any sanction which might adversely affect the ability of the trier to reach a decision on the merits should be avoided where possible.

Indicating to the jury that an inference against a withholding litigant can be drawn, while permitting the withholder to explain why evidence was withheld, is an available sanction. But the force of the adverse inference is substantially reduced where there is a reasonable ground for withholding and where serious detriment would be suffered if the documents were produced.

### 2. Analogy to Lies

An analogous situation to spoliation exists with respect to inferences to be drawn from testimony of a witness believed by the trier to have lied. Learned Hand pointed out in *Dyer v. MacDougall,* 201 F.2d 265 (2d Cir.1952), that a party oppos-

ing a motion for summary judgment cannot rely solely on a lack of credibility in the moving party's proposed testimony to get to a jury. "[A]lthough it is therefore true that in strict theory a party having the affirmative [burden at trial] might succeed in convincing a jury of the truth of his allegations in spite of the fact that all witnesses denied them, we think it plain that a verdict would nevertheless have to be directed against him." *Id.* at 269.

█ Aside from attacking a witness's denial of an alleged fact or series of facts, "[t]here must be some affirmative evidence that the event occurred." *Goldhirsh Grp., Inc. v. Alpert,* 107 F.3d 105, 109 (2d Cir. 1997) (quoting 9A Wright & Miller, Federal Prac. and Proc. Civil 2d § 2527). "Normally the discredited testimony is not considered a sufficient basis for drawing a contrary conclusion." *Bose Corp. v. Consumers Union of U.S., Inc.,* 466 U.S. 485, 512, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984). As a matter of law, a party that bears the burden of proof at trial must demonstrate the truth of a disputed material fact with something more than an inference that opposing witnesses are lying or evidence is not as it seems. *See Hahn v. Sargent,* 523 F.2d 461, 467 (1st Cir.1975); *Letscher v. Swiss Bank Corp.,* No. 94–CV–8277, 1997 WL 304895, at *4 (S.D.N.Y. June 5, 1997) ("It is thus apparent that Letscher's sole hope of prevailing at trial is to convince the jury to disbelieve the denials of the Swiss Bank employees. The Second Circuit has indicated, however, that a party cannot survive a motion for summary judgment based on such hope.") (citing *Goldhirsh Grp., Inc.,* 107 F.3d at 109). *See also* John H. Mansfield et al, Evidence: Cases and Materials 90 (9th ed. 1997) (limited probative force of a lie to support a finding of its opposite).

The Court of Appeals for the Second Circuit in *Kronisch* essentially follows, in the case of spoliated documents, much the same track as *Dyer* and its progeny do with respect to testimony. The teachings of *Kronisch* are as follows:

Concluding (or, for purposes of summary judgment, assuming) that a party has intentionally destroyed evidence that it had an obligation to preserve is not the end of the story.... We must also attempt to determine whether there is any likelihood that the destroyed evidence would have been of the nature alleged by the party affected by its destruction. This inquiry is part of our attempt to place the innocent party in the same position he would have been in had the evidence not been destroyed by the offending party. The task is unavoidably imperfect, inasmuch as, in the absence of the destroyed evidence, we can only venture guesses with varying degrees of confidence as to what that missing evidence may have revealed. Nonetheless, before we permit the drawing of an adverse inference, we require some showing indicating that the destroyed evidence would have been relevant to the contested issue....

Where, as here, a party loses the opportunity to identify ... a particular document or documents likely to contain critical evidence because the voluminous files that might contain the document(s) have all been destroyed ... the prejudiced party may be permitted an inference in his favor so long as he has produced some evidence suggesting that a document or documents relevant to substantiating his claim would have been included among the destroyed files.

Just how much evidence is enough to support an inference about the content of destroyed evidence cannot be precisely defined, and will necessarily vary from case to case.... Certainly, the level of proof that will suffice to support an inference in favor of the innocent party on a particular issue must be less than

the amount that would suffice to survive summary judgment on that issue. Otherwise, innocent parties meant to benefit from the adverse inference against offending parties would receive no benefit at all, having been deprived of evidence that may have been crucial to making their case, and yet being held to precisely the same standard of proof before they may present their case to a jury. *We do not suggest that the destruction of evidence, standing alone, is enough to allow a party who has produced no evidence—or utterly inadequate evidence—in support of a given claim to survive summary judgment on that claim.*

*Kronisch,* 150 F.3d at 127–28 (emphasis added; citations omitted).

■ Like an inference based on disbelief of a witness, any adverse inference based on a party's failure to produce documents (or spoliation) does not alone satisfy a party's burden to produce facts necessary to defeat a motion for summary judgment. Some quota of evidence is needed to assign probative force to withheld documents. Only in borderline cases—and in combination with "not insubstantial evidence"—can an inference of spoliation "allow the plaintiff to survive summary judgment." *Byrnie,* 243 F.3d at 107 (internal quotation marks omitted).

In sum, an adverse inference, without more, cannot satisfy a non-moving party's burden on summary judgment "to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex Corp.,* 477 U.S. at 323, 106 S.Ct. 2548. As demonstrated below, there is no such substantial evidence supporting plaintiff's case against the Bank.

## III. Anti–Terrorism Act

The legal standard for a claim under the ATA is laid out in *Gill I.* A brief review of the elements may be useful to the reader:

plaintiff must prove "three formal elements: unlawful *action,* the requisite *mental state,* and *causation.*" *Gill I,* at 502, (emphasis in original).

### A. Unlawful Action

■ On the first element—unlawful action—a plaintiff must prove it more probable than not that he or she was injured by "an act of international terrorism." 18 U.S.C. § 2333(a). An act of "international terrorism" must:

(1) involve a violent act or an act dangerous to human life that is *in violation of some federal or state criminal law, or that would be criminal if it were committed within the jurisdiction of the United States or any state,* (2) appear to be intended—as an objective matter—to intimidate or coerce a civilian population, influence a government's policy by intimidation or coercion, or affect a government's actions by mass destruction, assassination, or kidnapping, and (3) occur primarily outside of the United States, or transcend national boundaries in terms of the means by which it is accomplished, the persons it appears intended to coerce or intimidate, or the location in which the perpetrators operate or seek asylum.

*Gill I,* at 502–03, (citing 18 U.S.C. § 2331(1)) (emphasis added).

Like a civil RICO claim, a suit for damages under the ATA "is akin to a Russian matryoshka doll, with statutes nested inside of statutes." *Schwab v. Philip Morris USA, Inc.,* 449 F.Supp.2d 992, 1032 (E.D.N.Y.2006), *rev'd on other grounds sub nom. McLaughlin v. Am. Tobacco Co.,* 522 F.3d 215 (2d Cir.2008). Pleading and proving the violation of a predicate criminal provision is required to satisfy the first requirement of an ATA claim—i.e., violation of a federal or state criminal law. For purposes of a civil ATA claim, the predicate violation of a criminal provision is

decided under a preponderance standard. *See Sedima, S.P.R.L. v. Imrex Co., Inc.,* 473 U.S. 479, 491, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985) ("In a number of settings, conduct that can be punished as criminal only upon proof beyond a reasonable doubt will support civil sanctions under a preponderance standard." (collecting cases)).

As noted in Part II.A, *supra,* four of plaintiff's claims remain following the court's ruling on the Bank's motion to dismiss on the pleadings. Those claims depend on a finding that the Bank violated separate criminal statutes. In some instances, a predicate criminal act—for example, providing material support to terrorists in violation of 18 U.S.C. § 2339A—rests on violation of yet another criminal statute.

### 1. Conspiracy

The predicate for plaintiff's second claim for relief is 18 U.S.C. § 2332(b). *See* Am. Compl. ¶¶ 225–32. Under that statute, it is illegal to engage in a conspiracy to commit murder, to attempt to commit murder, or to cause or attempt to cause serious bodily injury to a United States national abroad. *See* 18 U.S.C. § 2332(b). Proof of a conspiracy under § 2232(b) requires a plaintiff to establish that the defendant "(1) knew about the aims and objectives of the [alleged] criminal conspirac[y], (2) agreed to the essence of these objectives, and (3) performed acts ... intended to further these objectives." *In re Terrorist Bombings of U.S. Embassies in E. Africa,* 552 F.3d 93, 114 (2d Cir.2008).

"To establish the existence of a criminal conspiracy, [plaintiff] must prove that the conspirators agreed on the essence of the underlying illegal objective[s] and the kind of criminal conduct in fact contemplated." *Id.* at 113 (citation, internal quotation marks, and ellipsis omitted). "[E]vidence of an explicit agreement" is not required,

but the party seeking to prove the conspiracy must show that an agreement existed. *Id.* (citation and quotation marks omitted). Circumstantial evidence may be used. *See United States v. Aleskerova,* 300 F.3d 286, 292–93 (2d Cir.2002) ("[W]e have found evidence sufficient to support a conspiracy conviction where circumstantial evidence establishes that the defendant associated with the conspirators in furtherance of the conspiracy.").

### 2. Material Support Statutes

Plaintiff invokes three statutes that criminalize provision of "material support" to terrorists as a predicate for three of his claims for relief. *See* Am. Compl. ¶¶ 233–55 (alleging violation of 18 U.S.C. §§ 2339A, 2339B, 2339C).

Section 2339A(a) of chapter 18 of the United States Code, which plaintiff uses as a predicate for his third claim for relief, criminalizes the provision of material support to terrorists if the defendant *knows* that the support will be used in the preparation for, or in the carrying out of, violations of certain criminal laws.

Plaintiff uses 18 U.S.C. § 2339B(a)(1) as a predicate for his fourth claim for relief. That provision criminalizes *knowingly* providing, attempting to provide, or conspiring to provide material support or resources to a foreign terrorist organization, or "FTO." *See* 18 U.S.C. § 2339B. A defendant "must have knowledge that the organization is a designated terrorist organization." 18 U.S.C. § 2339B(a)(1). "Material support" includes "financial services." *See* 18 U.S.C. § 2339B(g)(4). An FTO is "an organization designated as a terrorist organization under section 219 of the Immigration and Nationality Act." 18 U.S.C. § 2339B(g)(6). Provided by section 219 is a detailed procedure by which the Secretary of State may designate an entity as an FTO. *See* 8 U.S.C. § 1189.

■ As the Circuit Court of Appeals for the District of Columbia has explained, liability may attach under § 2339B when a defendant provides material support to the alter ego or alias of a designated FTO. *See Nat'l Council of Resistance of Iran v. Dep't of State,* 373 F.3d 152, 157–58 (D.C.Cir.2004) (Roberts, J.); *see also Goldberg v. UBS AG,* 660 F.Supp.2d 410, 432 (E.D.N.Y.2009) (adopting the reasoning of *Nat'l Council of Resistance of Iran* ). "[T]he requisite relationship for alias status is established at least when one organization so dominates and controls another that the latter can no longer be considered meaningfully independent from the former." *Nat'l Council of Resistance of Iran,* 373 F.3d at 158. "Domination" and "control" of one organization over another is determined with reference to agency law. *Id.* at 158–59.

In his fifth claim, plaintiff alleges violation of 18 U.S.C. § 2339C as a predicate for civil liability. Under 18 U.S.C. § 2339C, it is illegal, "by any means, directly or indirectly, unlawfully and *willfully* [to] provide[ ] and collect[ ] funds *with the intention* that such funds be used, *or with the knowledge* that such funds are to be used, in full or in part, in order to carry out" terrorist activities. 18 U.S.C. § 2339C(a)(1) (emphasis added). Section 2339C defines "provide" to include "giving, donating and transmitting" and "collect" to include both "raising and receiving." 18 U.S.C. § 2339C(e)(4), (5).

### B. Mental State

■ With regard to the second element—mental state—, "a plaintiff must prove that a defendant acted intentionally, knowingly, or recklessly." *Gill I,* at 503. "First, it must be shown that the defendant's alleged actions were reckless, knowing, or intentional. Second, a connection must be made between the defendant's mental state and the potential for harm to American nationals." *Id.* at 506. An ATA claim may not be predicated on a theory of strict liability or negligence. *Id.* at 481–82, 505–06.

Several possible scenarios would satisfy the mental state requirement of the ATA, including that:

1. The defendant knew, and it was the case, that a terrorist organization it supported intended to injure an American;

2. The defendant intended that its support of a terrorist organization lead to an injury of an American, regardless of the terrorist organization's intention; or

3. The defendant was reckless with regard to the substantial probability of an injury that would likely be suffered by an American as a result of its and the terrorist organization's actions.

*Id.* at 506. "Combined recklessness on the part of the defendant and the terrorist organization [is] a sufficient basis for liability." *Id.*

### C. Causation

■ Proof of proximate causation must be established for liability to be found under the ATA. *See id.* at 507; *see also id.* at 522–23. "A section 2333(a) plaintiff alleging material support must prove that a defendant's actions were a proximate cause of the injury of which he complains." *Id.* at 508 (citing *Hydro Investors, Inc. v. Trafalgar Power Inc.,* 227 F.3d 8, 15 (2d Cir.2000)). "But for" causation is not required under § 2333(a). *Id.* "Temporal and factual issues will often be crucial, in particular cases, in proximate cause inquiries pursuant to section 2333(a)." *Id.*

Proximate cause is just one of "the judicial tools used to limit a person's responsibility for the consequences of that person's

own acts." *Holmes v. Sec. Inv. Protection Corp.*, 503 U.S. 258, 268, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992). Analysis of the concept requires "considerations of policy, fairness, and practicability," and "not ... blind adherence to ancient rigid classifications and abstractions." *Blue Cross & Blue Shield of N.J. v. Philip Morris*, 36 F.Supp.2d 560, 579 (E.D.N.Y.1999).

 Foreseeability is "a touchstone for proximate cause analysis." *Id.* at 580. Harms that can be prevented *ex ante* should be deterred. Intentions matter. "Those who have acted intentionally or with reckless disregard for the health of others have difficulty convincing the law that it is unjust or unwise for society to hold them responsible for the damages which foreseeably follow from their deliberate actions." *Id. See also Gill I*, at 505–06, (recklessness considerations are "closely related" to those of proximate cause under ATA). Appropriate analysis requires a fact-specific and flexible approach taking into account the effort expended to commit an act and the foreseeability of the act's consequences. "At bottom," the Supreme Court has declared, "the notion of proximate cause reflects 'ideas of what justice demands, or of what is administratively possible and convenient.'" *Holmes*, 503 U.S. at 268, 112 S.Ct. 1311 (quoting W. Keeton et al., Prosser and Keeton on the Law of Torts § 264 (5th ed. 1984)).

When the predicate criminal act alleged in an ATA claim involves provision of material financial support to terrorists, as is the case here, the money alleged to have changed hands "need not be shown to have been used to purchase the bullet that struck the plaintiff." *Id.* at 507. But moral blame should only follow if the harm caused by providing bank services to terrorists is foreseeable. "Thus, a major recent contribution with a malign state of mind would—and should—be enough" to satisfy the causation requirement under the ATA. *Id.* "But a small contribution made long before the event—even if recklessly made—would not be." *Id.* "[T]he court rejects the contention that *any* reckless contribution to a terrorist group or its affiliate, no matter how attenuated, will result in civil liability, without the demonstration of a proximate causal relationship to the plaintiff's injury." *Id.* at 522 (emphasis in original)

## IV. Lack of Evidence Supporting Plaintiff's Claims

### A. Conspiracy

The conspiracy alleged by plaintiff requires that the Bank and Hamas or "others" agreed explicitly or implicitly to murder or attempt to murder or seriously injure an American national while he was abroad. *See* 18 U.S.C. §§ 2332(b) & 2333(a). Plaintiff alleges that the Bank "acted in concert with, and agreed to combine with, HAMAS and others, and knowingly or intentionally entered into a tacit, illegal agreement to provide support to HAMAS and its co-conspirators for acts of international terrorism ... and committed overt acts in furtherance of the conspiracy." Am. Compl. ¶ 231.

 Plaintiff appears to have conceded that there is no basis for the conspiracy claim. There is no evidence regarding any agreement entered into by the Bank explicitly or implicitly or steps taken by it in furtherance of such a conspiracy. The word "conspiracy" is only mentioned twice in plaintiff's brief; both are in the same footnote regarding whether an inference of continued material support to Hamas is warranted. *See* Pl. Mem. of Law in Opp'n to Def. Arab Bank plc's Mot. for Summ. J. ("Pl. Mem."), Oct. 23, 2012, CM/ECF No. 191 at 34 n.61. A jury could not conclude that defendant agreed to any common plan with or took substantial steps in further-

ance of that plan. *See Anderson,* 477 U.S. at 254, 106 S.Ct. 2505 (non-moving plaintiff's evidence must be sufficient in light of his burden of persuasion at trial).

### B. Material Support

#### 1. Scienter

There is no evidence that the Bank willfully, knowingly, or intentionally provided material support to the shooter or any organization he might have been affiliated with in violation of the criminal material support statutes codified at 18 U.S.C. §§ 2339A, 2339B, or 2339C. The acts of the Bank relied on by plaintiff are so remote in time and attenuated in their inferential value as proof of an element of any cause of action as to constitute less than a scintilla.

It is contended by plaintiff that the Bank maintained accounts and provided financial services to Hamas essentially through the following channels:

1. The Saudi Committee through administration of a "martyrs" payment system;

2. Palestinian charities that were actually front organizations for Hamas;

3. Account holder Osamah Hamdan, an individual designated by the United States as a Specially Designated Global Terrorist; and

4. Individuals affiliated with Hamas.

*See generally* Pl. Mem. at 15–29.

The essence of plaintiff's theory is that, through provision of banking services to terrorist individuals and organizations, the Bank acted at least recklessly in providing material support that would be funneled to Hamas and would probably be used to harm an American in 2008. The requirement that a defendant be "at least reckless with regard to the fact that American nationals probably would be harmed as a result of his actions is closely related to, although conceptually distinct from, an

analysis of whether a defendant's actions were a proximate cause of injuries suffered by an ATA plaintiff or an ATA plaintiff's decedent." *Gill I,* at 506.

Though distinct, the three material support statutes relied upon by plaintiff all require willful or reckless proximate conduct on the part of the Bank. The statutes do not require intent to commit specific acts of terrorism, but the ATA itself requires a plaintiff to demonstrate "a connection ... between the defendant's mental state and the potential for harm to American nationals." *Id.*

A defendant must be more than merely negligent. Under a negligence regime, "the failure to detect a theft or forgery beneath the cover of deceptive entries" may expose financial institutions accused of violating the material support statutes "to a liability in an indeterminate amount for an indeterminate time to an indeterminate class." *Ultramares Corp. v. Touche,* 255 N.Y. 170, 179–80, 174 N.E. 441 (1931) (Cardozo, C.J.). Recklessness requires the defendant to be conscious "of the risk of harm created by [its] conduct" while "the precaution that would eliminate or reduce the risk involves burdens that are so slight relative to the magnitude of the risk as to render the [defendant's] failure to adopt the precaution a demonstration of the [defendant's] indifference to the risk." Restatement (Third) of Torts § 2 (2010); *see also Boim v. Holy Land Found. for Relief and Dev.,* 549 F.3d 685, 695 (7th Cir.2008) (potential harm created by activity must be "wildly disproportionate to any benefits that the activity might be expected to confer").

The issue here, on summary judgment, is whether available evidence could lead a jury to conclude more likely than not that the Bank willfully or recklessly provided material support to Hamas while aware of

the probability that Hamas would harm an American citizen in or about 2008.

### a. *Respondeat Superior*

Plaintiff is correct in contending that the ATA provides for corporate liability on a theory of *respondeat superior.* Defendant's argument is that the Bank's state of mind must be adduced by a showing that the corporation's officers or directors—and not its employees—engaged in a culpable act with the requisite scienter. *See* Mem. of L. of Def. Arab Bank plc in Supp. of Its Mot. for Summ. J. ("Def. Mem."), Oct. 12, 2012, CM/ECF No. 163 at 13–16. The Bank argues that, by awarding treble damages, the ATA imposes punitive damages, and that establishing a claim against a corporation under a punitive damage statute requires a showing that the corporate defendant's officers or directors engaged in knowing misconduct. *Id.* at 14–15.

No court within the Second Circuit has ruled on whether the ATA permits proof of scienter on a theory of *respondeat superior.* Plaintiff points to two cases outside of the Second Circuit that purport to have interpreted the ATA to include corporate liability premised on a theory of *respondeat superior.* Pl. Mem. at 9. One of the cases cited by plaintiff, *Abecassis v. Wyatt,* 785 F.Supp.2d 614 (S.D.Tex.2011), found an ATA claim sufficiently pled against an corporation by virtue of the conduct of its employee but did so without any analysis, assuming that liability through a theory of *respondeat superior* is available under the ATA. *See Abecassis,* 785 F.Supp.2d at 650. The other case, *Estate of Parsons v. Palestinian Authority,* 651 F.3d 118 (D.C.Cir.2011), does not hold that corporate liability under the ATA can be established by a theory of *respondeat superior.* The portion of *Parsons* cited by plaintiff is to a section of Judge Janice Rogers Brown's concurring opinion in which, writing only for herself and not the court, she interpreted the ATA to permit recovery on a theory of *respondeat superior. See id.* at 148 ("Judge Henderson and Judge Tatel avoid deciding whether the Palestinian Authority can be held liable for the actions of its National Security checkpoint personnel. . . .").

Congress, when enacting the ATA's civil remedy provision, "intended to *incorporate general principles of tort law* . . . into the [civil] cause of action under the ATA." *Wultz v. Islamic Republic of Iran,* 755 F.Supp.2d 1, 55 (D.D.C.2010) (emphasis added). Applying general principles of *respondeat superior,* it is essential that plaintiff can rely on that doctrine on this motion. But no evidence has established that any employee of the Bank did any act reflecting requisite scienter.

### b. Pertaining to Banking Services Provided to Saudi Committee

Plaintiff alleges that the Bank administered a payment distribution system on behalf of the Saudi Committee for the Support of the Intifada Al Quds (the "Saudi Committee") to designated families of "martyrs" of Hamas and those wounded or imprisoned in the course of perpetrating terrorist attacks. *See* Am. Compl. ¶ 177. To prove the Bank's mental state in providing banking services to the Saudi Committee, Plaintiff relies on information and a chain of inferences of remote dates with little or no citation or documentation and no persuasive argument supporting relevancy to the Bank's state of mind, as follows:

1. During the Second Intifada, Hamas employed suicide bombers directed at Israeli buses and cafes. *See* Pl. Mem. at 15.

2. Those suicide bombers were motivated by cash payments, including cash payments from Hamas, the Palestinian Authority, Saddam Hussein, the Saudi Committee, and Hezbollah. *See id.* at 15–16. Those pay-

ments were primarily funneled through the Bank at dates remote from 2008. *See id.*

3. The Saudi Committee transmitted "tens of millions of dollars" through Arab Bank at dates remote from 2008 to Palestinian "martyrs," their families, and those wounded or imprisoned during the Second Intifada. *See id.* at 16.

4. The Saudi Committee transmitted to the Bank a "Martyrs List" which the Bank used to distribute martyr payments. To support this claim, plaintiff cites to a spreadsheet entitled "Lists of Names of Martyrs to Substitute the Existing Transfers at the Bank." *See id.* at 16 (citing Decl. of Aaron Schlanger in Supp. of Pl. Resp. ("Schlanger Decl.") Ex. 484, Oct. 23, 2012, CM/ECF No. 193). For each martyr listed on the spreadsheet, the "date of death" and "cause of death" are provided. *See id.* Based on the dates provided, the "martyr list" pertains to no act of terrorism after 2001.

5. Efforts by Bank personnel to call the beneficiaries of Saudi Committee payments. *See* Pl. Mem. at 17. The support for this statement is the testimony of Bank employee Fazwan Shukri, who stated that where a phone number was provided in transfer instructions, Bank personnel would attempt to call those beneficiaries and notify them of the receipt of a transfer on their behalf. *See* Arab Bank plc's Statement of Material Facts as to Which There Is No Genuine Dispute Pursuant to Local Civ. R. 56.1 ("Def. 56.1") ¶ 480 (citing Dep. of Fazwan Shukri 116). This practice is not shown to be different from transfer accommodations to other transferees.

6. Denials by Bank personnel that any Bank employee read the column of the list stating the "cause of death" for each martyr is a matter of credibility for the jury. This denial is not affirmative proof. *See* Part III.D, *supra*, dealing with probative force of false testimony.

7. Before 2004, the Saudi Committee went by the name "The Saudi Committee for the Support of the Intifada Al Quds." The term "Intifada Al Quds" referred to violence aimed against Israel. *See* Pl. Mem. at 16.

8. The Saudi Committee's original website—presumably in operation before 2004—"openly declared its funds were distributed to the families of martyrs through Arab Bank's branches in Palestine." *See id.* at 16.

9. An advertisement that ran in the May 15, 2001 edition of the Palestinian Daily *Al–Hayat Al–Jadida,* appearing in the name of the Al–Ansar society (allegedly affiliated with Hezbollah, a terrorist organization), purported to call on residents of the West Bank and Gaza to go to their local Arab Bank branch to collect martyr payments. Plaintiff has provided a copy of the English-language translation of the advertisement, although nowhere on the advertisement is the term "Arab Bank." *See* Schlanger Decl. Ex. 485 (Advertisement in *Al–Hayat Al–Jadida,* May 15, 2011).

10. The presence of "posters of suicide bombers and other martyrs of the resistance" on the walls of Arab Bank branches in the Palestinian Territories. *See* Pl. Mem. at 17 (citing Schlanger Decl. Ex. 106 (Dep. of Mohamad Tahan 167)). The support plaintiff offers for this contention is specious. In response

to questioning by plaintiff's attorney asking whether he has "ever seen any suicide bomber posters on the Arab Bank buildings in the Palestinian Territories," the witness testified "you find these all over on the streets. When we remove them, they are replaced." Schlanger Decl. Ex. 106 (Dep. of Mohamad Tahan) at 167).

11. Plaintiff does not specify when the Second Intifada began or ended but states, in footnote 27 on page 16 of his memorandum, that "the Intifada had largely run its course" by 2004. *See* Pl. Mem. at 16 n.27.

Plaintiff points to no evidence of any substantial probative force suggesting that the Bank's provision of banking services to the Saudi Committee was a willful attempt to aid the terrorist—assumed for these purposes to have been directed by Hamas—who injured plaintiff. Much of the evidence relied upon by plaintiff is unsupported by documentary or testimonial proof. It long predated the shooting. *See* Hr'g Tr., Nov. 2, 2012, at 24 (MR. OSEN [plaintiff's attorney]: ... "The Saudi Committee Program payments were from 2000 to 2002.").

The evidence proffered by plaintiff has less than a shadow of weight on the issue of whether the Bank provided support to the Saudi Committee with reckless knowledge that its support up to 2004 would probably result in harm to an American in 2008.

### c. Pertaining to Banking Services Provided to Palestinian Charities

Plaintiff argues the Bank knowingly transferred money to charitable organizations that were front organizations for, and agents of, Hamas. *See* Pl. Mem. at 22–23. Plaintiff points to "notice" events to demonstrate the Bank knowingly provided financial services to Hamas's agents in violation of the material support provisions. They are too remote in time, with no bearing on an act of the Bank relevant to the 2008 period, and in *de minimis* amounts as to support for the Bank's state of mind in 2008. They are:

1. In September 1997, the Palestinian Authority closed sixteen Hamas-affiliated organizations. Plaintiff cites a September 26, 1997 article from a Palestinian daily newspaper stating that the Islamic Society in Gaza is "headed by Hamas leader Ahmad Bahar." *See* Pl. Mem. at 22 n.35.

2. In 2003, the German government froze accounts of the Al Aqsa Foundation located at the Bank's branch in Frankfurt. *See* Pl. Mem. at 22.

3. In 2003, the United States Department of Justice served the Bank with Mutual Legal Assistance Treaty ("MLAT") requests for records for four institutions with accounts at the Bank's branch in London. *See* Pl. Mem. at 22.

4. In February 2004, during a raid of the Bank's Ramallah branch, the Israel Defense Forces seized balances of three Hamas-affiliated institutions subject to MLAT requests. *See* Pl. Mem. at 22–23.

5. In July 2004, the Bank was served with the *Linde* complaint, which identified certain of the Bank's customers as "Hamas-controlled institutions." *See* Pl. Mem. at 23. During the same month, the United States government indicted the Holy Land Foundation. *See id.*

6. In April 2005, United States regulators investigated the Bank's New York branch for terrorist financing and served the Bank a blacklist of Hamas-affiliated account holders prepared by the Israeli government. *See* Pl. Mem. at 23.

7. In its response to discovery requests in this case, the Bank admitted it maintains three accounts for "institutions" listed on a blacklist issued by the Israeli government in 2005. *See* Pl. Mem. at 23.

There is no proof that anything but routine financial services to the charities alleged to be front organizations were provided, and none of the charities were designated by the United States as front groups when the charities received services from the Bank. *See* Def. Mem. at 18–19. Many of the entities at issue "received grants from the United States Government" when they held accounts with the Bank. *See id.* (citing Def. 56.1 ¶¶ 340–41). Based on the "notice" events relied upon by plaintiff, a reasonable jury could not find that the Bank *willfully* provided timely material support to charitable organizations with reckless disregard for whether that support would lead to a terrorist attack aimed at injuring an American in 2008. All of the "notice" events took place in 2005 or earlier; they have no substantial probative force in proving the Bank's intentions concerning an event that took place in 2008.

The Bank admits that it maintains accounts for three entities listed on a blacklist created by the Israeli government in 2005. *See* Pl. Mem. at 36. Three accounts among the thousands the Bank maintained does *not* itself supply a shadow of evidence on the issue of whether the Bank recklessly provided financial services to Hamas with knowledge that its services would probably lead to a terrorist harming an American national in 2008. Plaintiff proffers no evidence of how much money the Bank funneled to Hamas through any alleged front group that had an account at the Bank. Only four funds transfers related to United States-designated FTOs, SDTs, and SDGTs were processed in 2006 and none were processed in 2007 or 2008.

*See* Decl. of Mohammed Dabbour ("Dabbour Decl."), Oct. 25, 2012, CM/ECF No. 203–15, ¶ 2.

### d. Pertaining to Banking Services Provided to Osama Hamdan

Osama Hamdan was designated a SDGT by the United States government on August 22, 2003. *.See* Pl. Resp. ¶ 533. Hamdan opened an account at one of the Bank's branches in Lebanon in July 1998, *see* Pl. Resp. 56.1 ¶ 526; the money in that account was returned to Hamdan in 2005 when the Bank closed the account.

The parties dispute when the Bank learned of Hamdan's possible affiliation with Hamas. *See* Pl. Resp. ¶ 531. Plaintiff points to several facts that demonstrate the Bank's knowledge of Hamdan's status as an affiliate of Hamas dating back to 1998:

1. In December 1998, Hamas launched a website that listed the Arab Bank account number affiliated with the Hamdan account as a destination for donations to be made. *See* Pl. Mem. at 24.

2. From 1998 to 2001, three transfers were made to the Hamdan account which explicitly referenced "*Harakat al-Mukawama al-Islamiya*" (the Islamic Resistance Movement). A senior officer at the Bank reviewed those transactions and approved them by placing his initials opposite the "Hamas" notation. *See* Pl. Mem. 24.

3. Hamdan was a well-known terrorist in Lebanon, as reflected in interviews he granted to media outlets to defend a suicide bombing at the Park Hotel in Netanya, Israel on March 27, 2002. *See* Pl. Mem. at 25. No citation to documents or testimony is made in support of this claim.

4. The United States government designated Hamdan as a SDGT in August 2003. *See* Pl. Mem. at 25. In September 2003, the Special Investigation Commission ("SIC") of the Lebanese Central Bank provided all Lebanese banks, including defendant, with a list of recently-designated SDGTs that contained Hamdan's name, instructing the banks to report within one week whether they maintained an account for any of the individuals or organizations listed. *See id.* The Bank responded to the SIC explaining that it did not contain sufficient information to determine whether the names stated on the SIC's list were account holders and requested additional information. *See id.*

5. In July 2004, the *Linde* complaint identified the Hamdan account as being affiliated with Hamas. *See id.* at 26.

6. On August 30, 2004, the Bank decided to pay Hamdan the balance of the account. *See id.*

7. On September 1, 2004, the Bank informed the SIC that Hamdan's account was closed on August 30, 2004. *See id.*

8. In March 2005, the Bank returned the remaining balance in the closed Hamdan account—approximately $8,500—by issuing a check to Osama Hamdan. *See id.* 24.

Viewed most favorably to plaintiff, a reasonable jury might conclude that the Bank violated one of the material support of terrorism statutes *in 2005 or before.* Plaintiff has adduced no evidence from which a reasonable juror could infer that the Bank knew that earlier provision of financial services to Hamas would probably be used to injure an American *in or after 2008.*

### e. Pertaining to Banking Services Provided to Other Individuals Allegedly Affiliated with Hamas, and Other Designated Terrorists

Plaintiff points to the Bank's maintenance of accounts and processing of transfers for designated terrorists as a ground for holding defendant liable. *See* Pl. Mem. at 18–22, 28–29.

Provided by plaintiff is a list of twelve individuals it identifies as being affiliated with Hamas and accounts holders at the Bank. *See* Pl. Mem. 18–19. As plaintiff acknowledges, three of them died between 2002 and 2004. *See id.* Resting on the fact that the Bank has given no indication to the contrary, plaintiff assumes that the remaining nine customers remained account holders at the Bank and were provided services with reckless intent. *See id.* at 18. There is no adequate basis for this assumption.

Maintenance of—in the plaintiff's words—a "who's who list of Hamas terrorist leaders" is not in itself probative of the Bank's state of mind without a showing that a reasonable jury could conclude it is more likely than not the Bank *intentionally* provided material financial assistance or *recklessly* failed to take into account the probability that terrorist attacks perpetrated by Hamas would harm an American in 2008. Considering the large number of customers the Bank had, the evidence has less than a trace of probative value. *See* Nov. 2, 2012 Tr. 5–6 ("MR. WALSH [for defendant]: ... [I]n a given year, there were certainly in excess of many hundreds of thousands and probably millions of individuals and entities that globally were calling upon the banking services of Arab Bank.").

Plaintiff points to the total amount of money transferred to and from the Hamas account holders listed above—over $3.7 million over a large number of years—and that, in the case of Bank customer Sheik

Ahmed Yassin, the Bank knew he was affiliated with Hamas. *See id.* at 20. *But see* Hr'g Tr., Nov. 2, 2012, at 5 ("MR. WALSH [for defendant]:.... [I]n New York, where the bank performed all of its dollar-clearing activities, there were approximately half a million transactions per year.... [I]n addition, ... I think our approximate [global] count is that there are millions of transactions ever year with an aggregate value of perhaps billions of dollars."). Gill also argues that a reasonable jury could find, based on the notoriety of the members of what he calls a "who's who list" of terrorists that maintained accounts with the Bank, that the "Bank would have taken note" that it was providing financial services to affiliates of Hamas based on those affiliates' notoriety and the large transactions made in their name. *See id.* 25. While the transfers appear to have been made in part after 2000, there is no evidence they were in close temporal proximity to the shooting that injured plaintiff. Sheik Yassin died in 2004, and no additional evidence has been presented from which a reasonable juror could infer that the Bank's support—whether intentional or not—in 2004 reflected on the Bank's state of mind with respect to actions that might affect an American adversely in 2008.

Plaintiff can point to no evidence that the Bank consciously disregarded a substantial risk that the services it provided would end up in the hands of Hamas and be used to perpetrate a terrorist attack on an American national in April 2008.

The table below, prepared by the court, indicates that the dates and amounts of the most recent transactions involving the twelve most prominent alleged Hamas affiliates identified by plaintiff as well as other alleged Hamas affiliates. The information below, even when viewed most favorable to plaintiff, fails to demonstrate any adverse state of defendant's mind as to events that took place in 2008:

| Individual | Most Recent Transaction | Number of Transactions | Value of Most Recent Transaction | U.S.— Designated Terrorist | Citation |
|---|---|---|---|---|---|
| Ahmed Yassin | May 30, 2001 | 1 | $60,000 | SDGT (Jan. 23, 1995) | Pl. Mem. at 18; Pl. Resp. ¶¶ 107, 164, 320, 323 |
| Haleemah Hasan Yassin | May 3, 2001 | 6 | $36,000 | No | Pl. Mem. at 18 |
| Salah Shehada | September 25, 2001 | 9 | $ 1,150 | No | Pl. Mem. at 19; Pl. Resp. ¶¶ 107, 164, 320, 323 |
| Ismail Haniya | September 27, 2001 | 19 | $38,000 | Non–Specially Designated National– Palestinian Legislative Council (2006) | Pl. Mem. at 19; Pl. Resp. ¶¶ 107, 164, 320, 323 |
| Abd al-Salam Ismail Haniya | September 25, 2001 | 12 | $ 1,500 | No | Pl. Mem. at 19 |
| Ismail Abu Shanab | August 10, 2001 | 10 | $36,000 | No | Pl. Mem. at 19; Pl. Resp. ¶¶ 107, 164, 320, 323 |
| Muhammad Shama'a | September 27, 2001 | 4 | $37,000 | No | Pl. Mem. at 19; Pl. Resp. ¶¶ 107, 164, 320, 323 |
| Abbas al-Sayed | May 11, 2001 | 9 | $13,000 | No | Pl. Mem. at 19 |
| Mahdi Haker al-Hanbali | February 14, 2002 | 28 | $ 5,000 | No | Pl. Mem. at 19 |

| | | | | | |
|---|---|---|---|---|---|
| Khaled Muhammad Amin al-Haj | February 14, 2002 | 18 | $ 6,500 | No | Pl. Mem. at 19 |
| Abdul Khaleq al-Natsche | July 27, 2001 | 1 | $15,000 | No | Pl. Mem. at 20 |
| Ghazi Hamad | January 2, 2002 | 15 | $ 8,500 | No | · Pl. Mem. at 20 |
| Abla Ibrahim Saleh Abu Shamala | December 20, 2000 | 1 | $ 2,655.78 | No | Decl. of Ariah Spitzen in Supp. of Pl. Opp. to Summ. J. ("Spitzen Decl."), Oct. 23, 2012, CM/ECF No. 191–1 at ¶ 3(a) |
| Abd al-Aziz Subhi Ahmad al-Atar | December 20, 2000 | 1 | $ 2,655.78 | No | Spitzen Decl. ¶ 3(a) |
| Rabab Hamad | January 6, 2001 | 1 | $ 2,655.78 | No | Spitzen Decl. ¶ 3(c) |
| Rida Abdalla Isma'il al-Sinwar | December 20, 2000 | 1 | $ 2,655.78 | No | Spitzen Decl. ¶ 3(d) |
| Sinyura Shaban Ahmad Abdallah | December 20, 2000 | 1 | $ 2,655.78 | No | Spitzen Decl. ¶ 3(e) |
| Fayez Mustafah Muhammad Shuhadah | June 6, 2002 | 1 | $ 5,314.65 | No | Pl. Resp. ¶ 320 |
| Suhair Mahmoud Makhtoub | December 20, 2000 | 1 | $ 2,655.78 | No | Pl. Resp. ¶ 320 |
| Ibrahim al Ahmed Khalid Muqadmah | May 23, 2001 | 1 | $ 2,655.78 | No | Pl. Resp. ¶ 320 |
| Jamal Salim al-Damuni | March 16, 2001 | 3 | $ 7,500 | No | Pl. Resp. ¶ ¶ 320, 323 |
| Muna Mansur | October 22, 2001 | 6 | $ 5,316.06 | No | Pl. Resp. ¶¶ 320, 476 |
| Shuhayl Ahmad Ismail al-Masri | October 22, 2001 | 1 | $ 5,316.06 | No | Pl. Resp. ¶¶ 439, 441, 468 |
| Atallah Yousef Abd al-Jabbar Amer | October 24, 2001 | 1 | $ 5,316.06 | No | Pl. Resp. ¶¶ 439, 466, 468 |
| Razan Husni Hilmi Halawa | February 17, 2002 | 1 | $ 5,311.56 | No | Pl. Resp. ¶¶ 439, 468 |
| Nidal Ahmad Mahmud Hutari | December 20, 2000 | 1 | $ 2,655.78 | No | Pl. Resp. ¶¶ 439, 468 |
| Hasan Husein Hasan al-Hutari | October 24, 2001 | 2 | $ 5,316.06 | No | Pl. Resp. ¶¶ 439, 466, 468 |
| Arnima Ahmad Hafez al-Taher | January 8, 2001 | 1 | $ 2,655.78 | No | Pl. Resp. ¶¶ 439, 468 |
| Fatima Ali Husein Halabiya | June 10, 2002 | 1 | $ 5,314.65 | No | Pl. Resp. ¶¶ 439, 468 |
| Yusuf Muhammad Yusuf Rihan | June 6, 2002 | 1 | $ 5,314.65 | No | Pl. Resp. ¶¶ 439, 468 |
| Zahira Mustafa Ahmad Asida | January 8, 2001 | 1 | $ 2,655.78 | No | Pl. Resp. ¶¶ 439, 468 |
| Muhammad Taher Naser | December 20, 2000 | 1 | $ 2,655.78 | No | Pl. Resp. ¶¶ 439, 468 |

| Muhanad Talal Mansur Sharim | April 4, 2001 | 1 | $ 1,325.64 | No | Pl. Resp. ¶¶ 439, 468 |
| --- | --- | --- | --- | --- | --- |
| Fatima Muhammad Abd al-Fatah Naqib | December 20, 2000 | 1 | $ 2,655.78 | No | Pl. Resp. ¶¶ 439, 468 |
| Abd el-Qader Ibrahim Mahrnud Hijaz | January 24, 2001 | 1 | $ 2,655.78 | No | Pl. Resp. ¶¶ 439, 468 |
| Firas Wa'el Taleb Abu Sharakh | January 24, 2001 | 1 | $ 2,655.78 | No | Pl. Resp. ¶¶ 439, 468 |
| Basel Muhammad Shafiq Abd al-Qadar al-Qawasmeh | December 19, 2000 | 1 | $ 2,655.78 | No | Pl. Resp. ¶¶ 439, 468 |
| Ra'ed Abd al-Hamid Abd al-Razaq Misk | January 13, 2004 | 1 | $ 132.97 | No | Pl. Resp. ¶¶ 439, 468 |
| Yusra Muhammad Al Tawil | June 23, 2001 | 1 | $ 5,316.06 | No | Pl. Resp. ¶¶ 439, 468 |

Nothing indicates that the Bank executed any of these transactions with knowledge that its conduct would probably result in harm to an American national in 2008. The Bank executes "no less than 1,000 wire transfers every day," see Pl. Resp. ¶ 39, and until 2005 cleared approximately 500,000 funds transfers per year through its New York branch, see Pl. Resp. ¶ 47. Electronic fund transfers are processed through "Straight–Through–Processing" that travel through automated servers and are processed without "manual intervention." Pl. Resp. ¶ 40. The transactions summarized above are just a fraction of the transactions automatically processed by the Bank. See Hr'g Tr., Nov. 2, 2012, at 5 (Bank processes approximately "millions of transactions every year with an aggregate value of perhaps billions of dollars").

In the late 1990s, the Bank adopted Know–Your Customer, Anti–Money Laundering and Counter–Terrorism policies and procedures. See generally Def. 56.1 ¶¶ 56–247. No later than 2003, the Bank installed computer systems to screen funds transfers at all of its global branches against a list of terrorists designated as such by the United States Department of Treasury's Office of Foreign Assets ("OFAC"). See Pl. Resp. ¶ 196. The policies and procedures were designed to prevent criminal misuse of the Bank's services. See id.

Disputed is whether the Bank always complied with its written procedures and the extent to which the Bank implemented computerized oversight mechanisms. See, e.g., Pl. Mem. at 30; Pl. 56.1 Resp. ¶ 61 ("A reasonable juror could conclude ... that Arab Bank's policies and procedures were designed to do nothing more than assuage the minimum concerns of regulators rather than genuinely detect suspect and illegitimate activities by the Bank's customers."). Plaintiff's skepticism of the Bank's compliance is rooted in the Bank's failure to produce customer records for individuals and entities that plaintiff alleges were terrorists. See, e.g., Pl. 56.1 Resp. ¶ 63. This failure to produce is not helpful to plaintiff on this motion. See Part II.D, supra.

#### f. Pertaining to Compromise with Federal Regulators

Found by the Office of Comptroller of the Currency ("OCC") in 2005 was that the Bank's New York branch "failed adequately to obtain sufficient information on funds

transfers" and to implement "a program to monitor money transfers for suspicious activity." *See* Consent Order, OCC, In the Matter of the Federal Branch of Arab Bank plc, New York, New York, AAEC–0512, Feb. 24, 2012 ("OCC Order") at 2. That same year, the Bank, without admitting to any adverse claim against itself, consented to pay a civil fine of $24 million to the United States Department of the Treasury to settle claims by the OCC and the Treasury Department's Financial Crimes Enforcement Network ("FinCEN"). The "Assessment of Civil Money Penalty" issued by FinCEN—but not agreed to by the Bank—states that the Bank "fail[ed] to implement an adequate system of internal controls to comply with the Bank Secrecy Act and manage the risks of money laundering and terrorist financing." Assessment of Civil Money Penalty, FinCEN, In the Matter of the Federal Branch of Arab Bank plc, New York, New York, 2005–2, Aug. 17, 2005 ("FinCEN Order") at 3.

The probative value of these findings as to the Bank's mental state is slight and, combined with the lack of any additional evidence demonstrating an improper state of mind, provides no support for inferring the Bank acted recklessly both before and after 2004 with respect to the attack. This evidence would not even support a finding of negligence, since it is inadmissible. *See* Fed.R.Evid. 408(a) (evidence of "furnishing, promising, or offering—or accepting, promising to accept, or offering to accept—a valuable consideration in compromising or attempting to comprise a claim" and "conduct or a statement made during compromise negotiations about the claim—except when offered in a criminal case and when negotiations related to a claim by a public office in the exercise of its regulatory, investigative, or enforcement authority" is inadmissible "on behalf of any party—either to prove or disprove the validity or amount of a disputed claim or to im-

peach by a prior inconsistent statement or a contradiction").

The findings contained in the orders are not admissions of reckless or intentional conduct; the Bank expressly did not admit or deny any wrongdoing in consenting to the OCC and FinCEN orders. The orders generally speak to the Bank's conduct during and before 2004, but not after. They acknowledge the Bank "largely complied with the requirement to cease clearing funds transfers once the [Treasury Department] designated an entity as a 'specially designated terrorist,' 'specially designated global terrorist,' or 'foreign terrorist organization.' " OCC Order 7. In denying plaintiff's administrative request for the OCC's Report of Examination that served as the basis of the OCC's order, the OCC stated that its *"assessment during the 2004–2005 examination is unlikely to depict accurately the situation nearly three years later, in April 2008, when plaintiff's injury occurred."* See Ltr. From Michael L. Brosnan, Senior Deputy Comptroller, Large Bank Supervision, OCC to Josh D. Glatter, Esq., at 2, Oct. 11, 2012, CM/ECF No. 178 (emphasis added).

Any inference properly drawn from the OCC and FinCEN orders or other withheld documents does not overcome the lack of proof regarding actions that occurred in 2008. *See* Part II, D, *supra.*

#### g. Summary

Plaintiff's evidence is entirely lacking in probative force supporting the truth of a vital material proposition of fact. All of the transactions involving alleged members of Hamas relied upon by plaintiff predate his injuries by more than three years and many pre-date his injuries by more than six years. Plaintiff can point to no additional significant evidence that makes it more likely than not that the Bank knowingly provided financial services to any possible Hamas supporters or mem-

bers listed in the table above while appreciating the risk that its actions would harm an American in 2008.

### 2. Proximate Cause

■■■ Even if there were proof establishing a guilty state of mind at some time in the past, plaintiff cannot establish that any of defendant's actions were the proximate cause of his injuries. He has two critical hurdles to surmount in order to demonstrate the Bank's conduct proximately caused his injuries. First, he must show that a reasonable jury could conclude that it is more likely than not that Hamas perpetrated the attack that injured him. Second, assuming plaintiff can demonstrate that Hamas perpetrated the attack, he must demonstrate that it is more likely than not that the Bank's provision of financial services to individuals or organizations affiliated with Hamas proximately caused the attack. He cannot establish this second critical element.

### a. Hamas's Responsibility for Plaintiff's Injuries

Any determination of whether the Bank proximately caused plaintiff's injury requires consideration of whether "Hamas probably directly or indirectly authorized the person who shot the plaintiff to shoot over the border from Gaza into Israel, and helped supply him with armaments purchased with its fungible assets." *Gill I*, at 523. It is assumed for the purpose of analyzing proximate cause that a reasonable jury could conclude that Hamas was directly or indirectly responsible for plaintiff's injuries.

Gill relies on the following evidence:

1. A video that purportedly depicts the shooting that injured plaintiff (the "Video");

2. Public claims of responsibility issued by those who might have been affiliated with Hamas on the day of the shooting;

3. Statements attributed to a suspected Palestinian terrorist while he was in custody of the Israeli police;

4. Two reports by the Israel Security Agency; and

5. Hamas's reaction to the killing of "*likely* shooter Abdallah Hassan Ahmad Al-Za'anin on June 18, 2012." Pl. Mem. at 47 (emphasis added).

As described below, much of this evidence is arguably inadmissible but, based on the admissible evidence adduced by plaintiff and the analyses by experts found admissible in *Gill II*, a reasonable jury could infer that the gunman who shot plaintiff was under Hamas control. But, assuming that this evidence is sufficient to attribute the shooting to Hamas, it is insufficient to tie the Bank to the shooting that resulted in plaintiff's injuries.

### i. The Video

Plaintiff contends the Video itself is a basis for denying summary judgment on the issue of Hamas's responsibility for the attack. *See* Pl. Mem. at 38–40. Portions of the Video are probably admissible but of insufficient probative value to permit a reasonable jury to conclude that Hamas was responsible for the attack. *See* Hr'g Tr., Nov. 2, 2012, at 45–57 (discussion of the Video).

The Video depicts the attack from a vantage point looking towards a crowd apparently including plaintiff. Observed first is a logo associated with the Al-Qassam Brigades and a notice that the Video was produced by the Hamas information center. *See* Ex. A to Decl. of Aaron Schlanger in Support of Pl.'s Opp. to Arab Bank's Mot. to Dismiss the Am. Compl., May 21, 2012, CM/ECF No. 31–2. The next frame depicts hovering helicopters which were not present at the scene. *See id.* An individual then sets up a tripod, places a machine gun on it, and fires

short bursts into an area in the distance where plaintiff probably was standing with a group. *See id.* The depiction totals one minute and fifty-five seconds.

By stipulation of the parties, it contains the following utterances, with on-screen text and logos added after the event, but before a broadcast of the Video:

| Time Stamp | Translation of Utterance, Plus On–Screen Text and Logos |
|---|---|
| 00:03 | One logo appears on screen. The logo is a "White circle with a yellow dome, a green flag and a rifle. The logo has green text on top which is illegible and red text on the bottom that translated [from Arabic to English] as follows: Ezzedeen Al–Qassam Brigades." Onscreen text appears which translates from Arabic to English as "Information Center" |
| 00:06 | Two logos appear on screen. The logo on the left is a "White circle with an orange dome, two rifles and a white flag. Over the white flag there is orange coloring. Within the circle there is illegible text and below the circle, within the triangle, there is also illegible text." The logo on the right is a "White circle with a yellow dome, a green flag and a rifle. Within the circle there is illegible text and below the circle, within the triangle, there is also illegible text." |
| 00:53 | Speaker No. 1 states, translated from Arabic to English: "Trust in God." |
| 00:54 | Speaker No. 2 states, translated from Arabic to English: "Trust in God." |
| 00:57 | Speaker No. 1 states, translated from Arabic to English: "Aim at him" |
| 00:58 | Speaker No. 1 states, translated from Arabic to English: "Trust in God" |
| 1:42 | Speaker No. 1 states, translated from Arabic to English: "Upwards Upwards" |
| 1:45 | Speaker No. 1 states, translated from Arabic to English: "Upwards" |
| 1:49 | Speaker No. 1 states, translated from Arabic to English: "He burnt it" |
| 1:53 | One logo appears on screen. The logo is a "White circle with a yellow dome, a green flag and a rifle. The logo has green text on top which is illegible and red text on the bottom that translated [from Arabic to English] as follows: Ezzedeen Al–Qassam Brigades." Onscreen text appears which translates from Arabic to English "Information Center" |

*See* Ltr. Enclosing Mutually Agreed–Upon Translation Pursuant to the Court's Order, Oct. 25, 2012, CM/ECF No. 198.

It is undisputed that the Video has been edited. *See* Pl. Resp. ¶ 574. "There is a discernible break early in the footage where it has been edited." *Id.* at ¶¶ 576, 580. Admitted by plaintiff is that the Video has been added to by including certain introductory and concluding material, as well as the overlay of the logos of the Izz al-din al-Qassam Brigades and the Defenders of Al–Aqsa." *Id.* The Izz al-din al-Qassam Brigades ("al-Qassam Brigades") is apparently the military arm of Hamas. The parties dispute the identity of the

Defenders of Al-Aqsa, with plaintiff asserting, and the defendant denying, that the group is a Hamas-affiliate. *See* Pl. Resp. ¶¶ 603–05.

To authenticate the Video plaintiff "must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Fed.R.Evid. 901(a). That burden has been met with respect to the depiction of the shooting itself. The Video is authenticated by witnesses who recall the events. Fed.R.Evid. 901(b)(1) (identifying evidence can be authenticated by "[t]estimony that an item is what it is claimed to be."). Both plaintiff and Dr. Michael Elterman, a witness to the attack,

testified that, aside from portions of the Video acknowledged to have been added, the Video is a fair and accurate depiction of the attack. *See* Pl. Mem. at 39.

No evidence has been proffered that explains when the introductory and concluding material, logos of al-Qassam Brigades and Defenders of al-Aqsa or other material were incorporated into the Video. The stamping of logos of the al-Qassam Brigades and Defenders of al-Aqsa on the Video, plaintiff suggests, are claims of "credit" for the shooting. These claims are unreliable hearsay that do not fit under any recognized exception that would permit introduction against the Bank. Their untrustworthiness is obvious as to Hamas's claim: the logos contradict each other; if Hamas's paramilitary arm, the al-Qassam Brigades, committed the attack, it would not seem likely that another entity committed the same shooting.

Nevertheless, one logo, the speed with which the Video was broadcast on a Hamas affiliate television station and other details, together with expert testimony, could establish that the attack was by Hamas, which in effect declared: "Hamas was responsible for this act and it approves this statement." *See also* Hr'g Tr., Nov. 2, 2012, at 46. The statement could be used against Hamas were it a party to this litigation, pursuant to Federal Rule of Evidence 801(d)(2) which provides that it is not hearsay if made by a party, or a representative of a party such as a party's employee or coconspirator. *See* Fed. R.Evid. 801(d)(2). Since there is no proof that Hamas and the Bank conspired, *see* Part IV.A, *supra*, or that Hamas and the Bank enjoyed a principal-agent relationship, no admissible evidence would allow a reasonable jury to infer that the statement of responsibility by Hamas can be used against the Bank as nonhearsay.

█ Rule 804(b)(3) allows admission of a statement as an exception to the hearsay rule if it was made by an unavailable declarant when the statement "was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to criminal or civil liability ... that *a reasonable person in the declarant's position would not have made the statement unless believing it to be true.*" Fed. R.Evid. 804(b)(3) (emphasis added). The reason for this exception is "the assumption that persons do not make statements which are damaging to themselves unless satisfied for good reason that they are true." Fed.R.Evid. 804(b)(3) advisory committee's note. This assumption is negated when the declarant has ulterior motives for admitting conduct. The motivation of self-interest in a claim of "credit" for a terrorist attack on a civilian undermines trustworthiness. An incentive exists for an individual or an organization to mislead. Under the perverse assumptions of terrorists, an armed attack on civilians reflects glory. Taking "credit" for such an attack is deemed a benefit, not a detriment, and is not reliable under the circumstances. The logos cannot be used against the Bank. *But see United States v. Mills,* 704 F.2d 1553, 1562 (11th Cir.1983) ("boastful" statement about racial murder in prison by member of white supremacist group admissible); *United States v. Mussare, III,* 405 F.3d 161, 168 (3d Cir.2005) ("bragging"); *United States v. Berrios,* 676 F.3d 118, 129 (3d Cir.2012) ("braggadocio").

█ Nor is the statement attributed to Hamas as being responsible for the attack admissible against the Bank under Rule 807, the residual exception, because, as already noted, it is not trustworthy.

Plaintiff points to the circumstances surrounding the Video's airing as probative of Hamas's involvement in the attack. *See* Pl. Mem. at 38–40. It is undisputed that

the Video depicts conduct—i.e., the shooting—that occurred at approximately 10:30 a.m. on the day plaintiff was shot and that it was aired on a television station, experts can testify, that was affiliated with Hamas no later than 1:20 p.m. the same day. *See id.* According to plaintiff, the most plausible interpretation of these circumstances is that Hamas perpetrated the attack, filmed the attack, created the Video, and transported it to the Hamas television station, where it was edited, then broadcast. *See id.*

The Video airing on a Hamas-affiliated television station hours after the attack is probative of Hamas's approval of the attack when analyzed by experts permitted to testify about Hamas's *modus,* but it does not tie the Bank to the attack. As already noted, claiming credit for a terrorist attack is not against a terrorist organization's interest. *See* Fed.R.Evid. 804(b)(3). That a Hamas-affiliated television station was used to broadcast the Video has only slight probative value on the issue of whether Hamas's assets were used to "help supply [the shooter] with armaments" or "indirectly authorized the person who shot [plaintiff] to shoot over the Gaza border and into [a group of civilians in] Israel." *Gill I,* at 523.

### ii. Public Claims of Responsibility

Among the potpourri of evidence that plaintiff offers to support his contention that an agent of Hamas fired the bullet that caused his injury is that "both the political and military arms of Hamas issued claims of responsibility [for the attack] on their official websites." Pl. Mem. at 44. Two "communiqués" were posted on allegedly Hamas-controlled websites in which Hamas and its armed military arm, the Al–Qassam Brigades, claimed responsibility for the shooting. *See* Pl. Resp. ¶ 598; Am. Compl. ¶¶ 11–12. For the same reasons the logos stamped onto the Video are inadmissible against the Bank,

the Internet "communiqués" are inadmissible. *See* discussion of 804(b)(3) and 807, *supra.*

Claims of responsibility for the attack by organizations in addition to those of the Al–Qassam Brigades or Defenders of al-Aqsa were reported in newspapers. *See* Def. 56.1 ¶¶ 560–65. Their existence draws into sharp focus the need for "favorable" publicity by many terrorist groups. This distorted view of these killer-groups overrides the benign motives that the Federal Rules of Evidence relies on as an indicator of reliability.

### iii. Confession by Ayoub Ahmed Abu Karim and Reports Issued by the ISA

Plaintiff proffers a signed 2011, post-arrest statement of alleged Palestinian terrorist Ayoub Ahmed Abu Karim and two reports issued by the Israel Security Agency ("ISA") to provide additional substantiation of Hamas's responsibility for the attack. *See* Pl. Mem. at 47.

In the alleged confession, Karim states that he joined the Defenders of al-Aqsa in 2009. *See* Schlanger Decl. Ex. 467 (confession of Ayub Abu Karim). He recounts that he was approached in 2009 by one "Abu Hamza Timraz," a 45–year–old "official" of the Defenders of al-Aqsa. *See id.* The members of Karim's "crew" and Karim were told by Timraz that "the Defenders of Al–Aqsa is a military arm of Hamas and belongs to it." *Id.* The two ISA reports reference Karim's confession to conclude that the Defenders of al-Aqsa is or was an agent of Hamas. *See* Expert Report of Igal, Sept. 4, 2012, CM/ECF No. 62–2, at 22 n.74 & 75. Plaintiff relies on the confession and two ISA reports to argue that the Video—containing logos representing the Al–Qassam Brigades and Defenders of al-Aqsa—unequivocally attributes "credit" to Hamas and only Ha-

mas because both logos are effectively those of Hamas.

Plaintiff seeks admissibility of the confession based on the statement-against-interest exception embodied in Federal Rule of Evidence 804(b)(3). *See id.* In connection with the reports published by the ISA, plaintiff invokes Federal Rule of Evidence 803(8)(C), which deems admissible "factual findings" from an authorized investigation." *See* Pl. Mem. at 48.

Neither exception converts the confession and ISA reports into admissible evidence against the Bank indicative of a link between the Defenders of al-Aqsa and Hamas. Karim's confession lacks trustworthiness. Timraz's declaration to Karim—which Karim then relayed to the ISA—is hearsay within hearsay and inadmissible unless it qualifies under its own exception to the hearsay rules. *See Parsons v. Honeywell, Inc.,* 929 F.2d 901, 907 (2d Cir.1991) (statement by third person relayed by witness to officer and inserted into police report was hearsay within hearsay and inadmissible). Timraz's statement cannot be admitted against the Bank as a statement against interest because it lacks trustworthiness. A terrorist leader of a relatively small operation in Gaza may need to claim a connection to a larger, "government" approved, militant force. This incentive may be strong when a terrorist leader is recruiting individuals to join his specialized cause. There is no indication that Karim had any firsthand knowledge about the Defenders of al-Aqsa's activities in April of 2008. Even if Timraz's declaration was admissible, it was uttered long after the attack that injured plaintiff. It is of limited probative value as to the relationship between the Defenders of al-Aqsa and Hamas at the time of the attack in 2008. And it does nothing to establish proximate cause against the Bank.

A public record such as the ISA reports is admissible if "neither the source of information nor other circumstances indicate a lack of trustworthiness." Fed.R.Evid. 803(8)(B). The relevant portions of the ISA reports appear to be based directly on Karim's relaying of information of uncertain provenance about the relationship between the Defenders of al-Aqsa and Hamas. The authors of the report, employed by a national security agency, are not subject to effective cross-examination. Plaintiff has adduced no evidence independent of the confession that served as a basis of the ISA reports' indication that the Defenders of al-Aqsa, as Hamas's agent, was responsible for the attack. *See* Pl. Resp. ¶ 652. Like Karim's confession on the issue of the relationship between the Defenders of al-Aqsa and Hamas, the ISA reports lack a verifiable conclusion of the relationship between relevant terrorist organizations.

### iv. Hamas's Reaction to the Death of Al–Za'anin

Plaintiff contends that Hamas's responsibility for the attack is "corroborated by the organization's reaction to Israel's killing of likely shooter [Za'anin]." Pl. Mem. at 47; Pl. 56.1 ¶ 607. Plaintiff's expert witnesses Gil Erez, Igal (last name withheld), and Eli Alshech opine that the individual depicted in the Video may be Abdallah Hassan Ahmed al-Za'anin, who was killed in an Israeli security operation on June 12, 2012. *See* Expert Report of Gil Erez, Sept. 4, 2012, CM/ECF No. 62–5; Expert Report of Igal, Sept. 4, 2012, CM/ECF No. 62–2; Expert Report of Eli Alshech, Sept. 4, 2012, CM/ECF No. 62–1. The experts base their opinions in part on the website of Hamas's National Security Forces. *See, e.g.,* Expert Report of Gil Erez 29. The National Security Forces website contained "photographs of senior Hamas security officials visiting [Za'anin's]

family's condolence tent" and stated that "Za'anin was a 'sergeant of military intelligence' in (Hamas's) National Security Forces." *Id.* Photographs of Za'anin later surfaced on the Internet showing him holding a machine gun of the same type used by the shooter in the Video. *See id.*

This evidence has no bearing on the Bank's conduct and is not probative of Hamas's responsibility for the attack. Inferring that Hamas was responsible for injuries suffered in 2008 from Hamas officials' public condolence call to Za'anin in 2012 is fraught with the same kind of inferential problems presented by American mafia condolence calls. Plaintiff's experts opine that Za'anin "likely" is the shooter depicted in the Video, but such conclusions are based on circumstantial evidence thinly connected to Za'anin. Even assuming that a jury could infer from plaintiff's expert witnesses that Za'anin was the shooter, Hamas's reaction to Za'anin's death only speaks to his affiliation with Hamas in June 2012. No reasonable jury could conclude from Hamas's reaction to Za'anin's death that the Bank had any role in the attack.

### b. Provision of Banking Services to Hamas

Plaintiff argues that proximate cause is supported by the magnitude and temporal proximity of funds transfers processed by the Bank to individuals and organizations allegedly affiliated with Hamas.

While the money funneled through the Bank "need not be shown to have been used to purchase the bullet that struck the plaintiff," the Bank's provision of financial services must be shown to have been "major," "recent," and "with a malign state of mind." *See Gill I,* at 507. Assuming plaintiff could demonstrate that the Bank acted recklessly, it has not shown that his—an American's—injuries were reasonably foreseeable by the Bank as a result of the size and timing of funds transfers put in issue by plaintiff. No single or total transfer highlighted by plaintiff establishes the requisite magnitude and temporal connection to the attack required to find that the Bank's actions proximately caused plaintiff's injuries.

The majority of allegedly illicit funds transfers lack a temporal connection to plaintiff's injuries. *See* Part IV. 1, *supra.* Any transfers of significant magnitude lack a causal connection to an event that took place in 2008; other transfers closer to the attack are of insignificant size and not sufficiently linked to Hamas or the gunman who injured plaintiff.

To support his proximate cause argument, plaintiff largely focuses his attention on accounts maintained and transfers processed by the Bank for individuals allegedly affiliated with Hamas. Plaintiff's argument on proximate cause notably shies away from any discussion of Osama Hamdan, the SDGT to whom the Bank wrote a check when closing his account in 2005. Hamdan's omission from plaintiff's argument on proximate cause underscores the difficulties of plaintiff's case. Inquiries into recklessness and causation will turn on overlapping sets of facts. Just as the Bank's provision of banking services to Hamdan are too remote to establish a reckless mental state, it cannot justify a finding that the Bank's conduct proximately caused plaintiff's injuries. *See* Part IV. B.2.d, *supra.*

Additional funds transfers processed through the Bank to individuals and entities allegedly affiliated with Hamas are equally devoid of a sufficient connection to the Bank's conduct and plaintiff's injuries. The majority of transfers involving Hamas's alleged founders and senior leaders occurred before 2006, with most occurring before 2002. *See* Pl. Mem. at 35; Dabbour Decl. ¶¶ 2–3 (only four transfers to United States designated terrorists in 2006 and

zero in 2007 and 2008); *see also* Dabbour Decl. ¶ 3 (quantity of money processed after 2004 related to Palestinian individuals or organizations designated as an FTO, SDT or SDGT was substantially transferred before 2006).

Plaintiff proffers evidence that the Bank processed transfers to both the current and former supreme commanders of the Al–Qassam Brigades. *See* Pl. Mem. at 33. But the former supreme commander, Salah Shehadeh, died in 2002, and the current commander, Abbas al-Sayd, last received a transfer processed through the Bank in February of 2002. *See* Pl. Mem. at 33 & n.60. While it is undisputed that al-Sayd commanded the alleged militant arm of Hamas at the time of the attack, funds transferred to him in 2002, at the height of the Second Intifada, cannot be found to have proximately caused injury to an American in 2008.

Connections between Hamas, the Bank, and third parties such as the Saudi Committee and Palestinian charities have little force. The funds transfers administered by the Bank for the Saudi Committee occurred before 2003. *See* Pl. Mem. at 35. No evidence is cited to support a contention that funds transfers made as late as 2002 were large enough to have a substantial effect on conduct in 2008. Although the contributions provided by the Bank to Palestinian charities seem substantial (at least $27.5 million), plaintiff fails to provide sufficient information to establish *when* the money was funneled to the "institutions" through the Bank, that the charities were alter egos of Hamas, or how plaintiff has calculated the amount of funds transferred. In nearly all instances, plaintiff fails to provide the *size* of such transfers or *when* they were made. Pl. Mem. at 34. Insufficient evidence is adduced to tie the personal bank accounts of individuals who may be affiliated with Hamas to Hamas

itself. More is required to establish liability of the Bank.

The experts' opinions are not supportive of the conclusion that the Bank's actions or non-actions were a proximate cause of the gunshot that harmed plaintiff. Proximate cause blocks plaintiff's recovery against the Bank.

## V. Conclusion

Defendant's motion to dismiss is granted. The case is dismissed.

Orders for trial are withdrawn.

Costs or disbursements are denied.

## VI. Glossary

Relevant United States Regulators:

- *United States Treasury Department's Office of Foreign Assets Control ("OFAC"):* administers and enforces economic sanctions based, inter alia, on United States national security goals and terrorism policies. See U.S. Dep't of Treasury, About, Office of Foreign Assets Control, http://www.treasury.gov/about/organization alstructure/offices/Pages/Office–of–Foreign–Assets–Control.aspx.

- *United States Treasury Department's Financial Crimes Enforcement Network ("FinCEN"):* administers and enforces money laundering and anti-terrorism financing policies. *See* What We Do, Financial Crimes Enforcement Network, http://www.fincen.gov/about_fincen/wwd/

Relevant United States Terrorist Designations:

- *Foreign Terrorist Organization ("FTO"):* an organization declared a terrorist by the United States Secretary of State in accordance with section 219 of the United States Immigration and Nationality Act. 8 U.S.C. §§ 1189(a)(1), (d)(4). Hamas is desig-

nated as an FTO. *See* Designation of Foreign Terrorist Organizations, 62 Fed.Reg. 52,650 (Oct. 8, 1997); Exec. Ord. No. 12,947, 60 Fed.Reg. 5079, 5081 (Jan. 25, 1995).

● *Specially Designated Terrorist* *("SDT"):* an individual or organization determined by OFAC, pursuant to Executive Order 12,947, to be a threat to the Middle East peace process. *See* 31 C.F.R. 595.311 *et seq.*; Exec. Order 12,947, 60 Fed.Reg. 5097 (Jan. 23, 1995), *amended by* Exec. Order 13,099, 63 Fed.Reg. 45167 (Aug. 20, 1998).

● *Specially Designated Global Terrorist* *("SDGT"):* an individual or organization found by OFAC, pursuant to Executive Order 13,224, to have committed or to pose a significant risk of committing acts of global terrorism. *See* 31 C.F.R. 515.305 *et seq.*; Exec. Order 13,224, 66 Fed.Reg. 49079 (Sept. 23, 2001).

SO ORDERED.